# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SUSAN E. POITRAS,                          )
                                           )
               Plaintiff,        )
                                           )
     vs.                                 )    No. 4:07CV1736-DJS
                                           )
GLAXO SMITHKLINE CONSUMER                  )
HEALTHCARE, LP,                            )
                                           )
             Defendant.         )

## ORDER

Now before the Court is defendant Glaxo SmithKline Consumer Healthcare's motion for summary judgment [Doc. #14], and plaintiff Susan E. Poitras' opposition thereto. The matter has been fully briefed and is ready for disposition.

### Standard of Review

In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the 'nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial.'" Burchett v. Target Corp.,

340 F.3d 510, 516 (8th Cir. 2003) (quoting <u>Rose-Maston v. NME</u> <u>Hosps., Inc.</u>, 133 F.3d 1104, 1107 (8th Cir. 1998)).  "To overcome a motion for summary judgment, '[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.'" <u>Reed v. Lear Corp.</u>, 556 F.3d 674, 678 (8th Cir. 2009) (quoting <u>Davidson & Assocs. v. Jung</u>, 422 F.3d 630, 638 (8th Cir. 2005)).

## Facts

For purposes of this motion, the Court finds that the following facts are not in dispute, or have not been properly controverted pursuant to E.D.Mo. L.R. 7-4.01(E).[1]  The following facts are those established by the depositions, affidavits, and records submitted by the parties, and are viewed in the light most favorable to plaintiff.

Plaintiff started working for defendant in 1999 at defendant's St. Louis manufacturing facility, which produces Tums and Oscal tablets.  Throughout her employment, plaintiff was a manufacturing technician.  Defendant's manufacturing department is divided into four areas, each of which performs a specific function of the manufacturing process.  These areas are "Blending," "Wet-Mix," "Tableting," and "Weigh-Up."  For several years, plaintiff worked primarily in Tableting making Tums, although she was also trained in Blending and Weigh-Up and would work in those

---

[1] "All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."  E.D.Mo. L.R. 7-4.01(E).

areas as needed.  In approximately 2004, plaintiff began working primarily in Tableting making Oscal, although she continued to work in Blending, Weigh-Up, and other areas within Tableting as needed.[2]

Plaintiff worked the evening shift from sometime in 2001 or 2002 until the end of her employment.  As a manufacturing technician on the evening shift, plaintiff reported to an evening shift unit leader, who in turn reported to the evening shift team leader.  Plaintiff had various team leaders during her employment with defendant, including Randy Batson, Will Daugherty, and David Vinlove.  Unit leader Bill Prott supervised plaintiff in Tableting, and unit leader Pete Petruso supervised plaintiff in Blending and Weigh-Up.

Defendant has published Standard Operating Procedures ("SOPs").  The SOPs, among other things, give basic instruction on how to operate the machinery and how to handle a document that is involved in that operation.  Defendant has a specific SOP that establishes the procedure for lot number identification of raw materials.  Pursuant to this SOP, an employee is responsible for verifying that the approved lot of raw material was being used by following this four-step procedure:

> A.   Upon receipt, each pallet of raw material will be marked with its GSK #, and receiving date; these appear on the pallet ticket.
>
> B.   Each new pallet of material and each bag **MUST** be checked by the Operator for the proper lot number before using.

---

[2]Plaintiff states that she feels like she was trained properly for the different positions she worked.

C.    Operators should check the receiving dates and GSK # as closely as the lot number as these play an essential role in identifying the lot and in inventory.

D.    If during the check, an odd lot number is found, **STOP PRODUCTION** and notify the Manufacturing Team Leader and Quality Department.

Of note, performing step (B) of this procedure checks that employees know what material is approved for use. Although plaintiff was trained on some SOPs, plaintiff states she cannot recall if she was specifically trained on the above SOP.

When working in Weigh-Up, plaintiff regularly used a mix sheet that set out steps and procedures for weighing the raw ingredients for tablet mixes. Similar to the SOP, the procedure on the mix sheet requires operators to obtain an approved lot and verify that they are using raw material that has been approved by visually checking the appropriate information. Operators must verify that they have completed this step of the required procedure by signing off on each mix sheet.

Plaintiff's work was also regulated by the Federal Drug Administration ("FDA"). Among other things, FDA regulations require defendant to keep track of and document which lot number of raw material goes into which batch. Plaintiff agrees that complying with all quality FDA and safety regulations, following SOPs, and completing batch record documentation correctly the first time were key responsibilities of her job. Plaintiff understood defendant's expectation that she record descriptions of all of her work in the manner directed by the company.

Defendant employs a progressive discipline system. Under this policy, the progressive disciplinary steps are: i) verbal warning; ii) written warning; iii) demotion; and iv) separation. Depending on the situation, an employee may receive a Performance Improvement Plan ("PIP") along with a written warning. The employee's performance is reviewed with the employee periodically during the term of the PIP. An employee is removed from a PIP once she has successfully completed the term of the PIP with no performance issues.

Defendant states that even if an employee is removed from a PIP, the employee is still considered to be at that step of the progressive discipline process. Further, defendant states that if an employee has additional performance problems after having been on a PIP, the employee is subject to an extended written warning or termination of employment, depending on the seriousness of the additional performance problems. Plaintiff disputes defendant's assertions that an employee remains at the same step of discipline after completing a PIP, and also disputes defendant's assertion regarding an extended written warning, stating that defendant's disciplinary statement contains no such language.

Depending on the seriousness of the underlying conduct, defendant may skip certain discipline steps, or even move directly to separation. For example, violations of defendant's Employee Conduct Policy may call for immediate discharge or other appropriate disciplinary action. In situations involving

violations of the Employee Conduct Policy, the progressive discipline issued depends on the seriousness of the violation.

Between 2003 and 2006, plaintiff received discipline and negative performance review ratings for performance problems, including: attendance issues such as abuse of start, break, and lunch times; teamwork issues stemming from a failure to work well with others; and safety issues, including failure to wear personal protective equipment, reading personal material on the production line, and leaving her line unattended.[3] These performance problems are reflected by four different supervisors in verbal and written warnings issued to plaintiff, two PIPs, and plaintiff's annual reviews. Plaintiff admits that all of these negative performance review ratings and disciplinary actions occurred before she requested or took Family Medical Leave Act ("FMLA") leave.

In February 2004, Batson issued plaintiff a verbal warning for continuing to read personal materials on the line despite prior coaching on that issue. In this verbal warning, Batson emphasized his expectation that plaintiff would not read personal materials on the line going forward, or she would be subject to further discipline. Although plaintiff does not dispute receiving the verbal warning, she states that such a warning was not fair because she did not have personal reading materials on the production floor at the time of that incident.

---

[3]The Court notes that plaintiff has submitted evidence that Batson felt she was a good performer, and that co-workers felt she was smart and was a good employee.

On March 11, 2004, Batson issued plaintiff's annual review for the year 2003. On this annual review, plaintiff received an overall rating of "partially met performance expectations," and a rating of "did not meet performance expectations" in the categories of collaboration, safety awareness, and integrity. Plaintiff was given a poor rating in the category of integrity because of her repeated failure to follow policy even after she was told that she was not following policy. Plaintiff's 2003 annual review noted that her supervisors conducted two coaching and counseling sessions with her in 2003 to address her failure to follow company policy, stating that she had continued to show a reluctance to follow policy with respect to adherence to break times, reading personal materials on the production line, and wearing her personal protective gear.

On March 15, 2004, Batson placed plaintiff on a PIP for her ongoing failures to wear her personal protective gear and to adhere to her allotted break times. After satisfying the conditions of her PIP, plaintiff was removed from the PIP in July 2004.

In March 2005, Daugherty, along with Prott, issued plaintiff's annual review for the year 2004. On this annual review, plaintiff received a rating of "improvement needed" in the category of teamwork-cooperation. Plaintiff's 2004 annual review again noted that she needed to work on adhering to start, break, and lunch times. The review also noted that plaintiff must continue to improve her teamwork skills. Plaintiff received a

"very good" in documentation and job knowledge, was rated between "good" and "very good" in initiative and performance, and received a "good" in safety.

In February 2006, Daugherty and Prott issued plaintiff's annual review for the year 2005. On this annual review, plaintiff received ratings of "needs improvement" within the categories of attendance, safety, and teamwork-cooperation. Plaintiff's 2005 annual review again noted that she needed to work on adhering to start and break times, improving her teamwork skills, and wearing her personal protective gear. Plaintiff received a rating of "good" in the area of maintaining records, job knowledge, performance, and safety.

On March 2, 2006, Vinlove issued plaintiff a written warning for continuing to read personal materials on the line despite having received a previous verbal warning on that issue, and having recently been asked to put away personal reading material. In this written warning, Vinlove emphasized his expectation that plaintiff would "not read personal material such as magazines or books, work crossword puzzles or play phone games in the production area." On March 6, 2006, Vinlove placed plaintiff on her second PIP for reading personal materials on the production line. Either Vinlove or Prott met with plaintiff sixty days into her PIP to discuss her progress. At that time, it was noted that plaintiff still needed to work on improving her monitoring of the presses and paperwork, as well as adherence to start and break times. After satisfying the conditions of her PIP,

plaintiff was removed from the PIP in June 2006.  At that time, plaintiff was informed that she should continue to meet the requirements put forth in her PIP, and that if improvements were not consistently maintained, defendant may initiate additional disciplinary steps up to and including separation of employment. Plaintiff states that the warning specifically stated, "Should your performance improve, and at a later date, the same or similar problems occur, the company may separate you without warning."

On October 5, 2006, manufacturing technician Maureen Post-Keller began an FMLA leave.  Later that day, plaintiff learned that she was scheduled to fill Post-Keller's spot running Line Three in Tableting.  Plaintiff understood that it was part of her job duties to work in Tableting.  Filling Post-Keller's spot would have resulted in plaintiff working near non-supervisory co-worker Jan Grither, with whom she had a previous personal conflict. Plaintiff states that when she went to sign in, the other Tableting operators and several other people were standing there, and it appeared to plaintiff as if they were waiting for her to come on the floor.  Plaintiff states that it was very intimidating, and that she got the feeling that she was not welcome.  Although none of the Tableting operators said anything to her, plaintiff turned around and walked off the floor.

Plaintiff became upset at the prospect of working in Tableting that night, and began experiencing difficulty breathing, heart racing, head throbbing, and cold sweats.  Plaintiff then sought medical attention from the on-site nurse, Linda Meyer.

Plaintiff communicated to Meyer that she had issues with a co-worker, and was now being asked to work next to that co-worker. Meyer testified that plaintiff came into her office with labored breathing, that she seemed disturbed, that her face was flushed, and that her hands were shaky.

Once plaintiff calmed down, human resources manager Cassandra Jones and Wet-Mix team leader Dennis Coulson met with plaintiff to discuss plaintiff's work assignment. It appeared to plaintiff that Jones and Coulson were trying to find another place for plaintiff to work that day.[4] Defendant reassigned her to work in Weigh-Up away from Grither. Plaintiff said "okay," and went to Weigh-Up.

However, plaintiff states she was not comfortable with staying at work and wanted to go home. Plaintiff states that when Jones arrived at Meyer's office, Jones told plaintiff that there was nothing defendant could do and that plaintiff was to leave her personal life at home. Further, plaintiff states that she asked to go home, but was told no, that defendant was shorthanded, and that plaintiff was needed at work. Plaintiff states that although she was allowed to work in a different area, she was not in a mental or physical state to perform at the level expected of her, and that she had not recovered from whatever had happened at the beginning of her shift.

---

[4]Plaintiff was the only employee on duty trained to run Line Three in Tableting, so, in light of Post-Keller's absence, reassigning plaintiff meant that defendant would have to shut down that line and miss production for the evening.

Plaintiff saw her doctor the next day, October 6, 2006. Plaintiff arrived at work later that afternoon with documentation from her doctor supporting her need for a medical leave of absence for stress. Plaintiff was permitted to begin her FMLA leave immediately. Plaintiff remained on FMLA leave from October 6, 2006, until January 8, 2007, thereby exhausting twelve weeks of FMLA leave. Plaintiff was paid her full salary during her FMLA leave.

Defendant states that, prior to plaintiff's request for FMLA leave on October 6, 2006, the day-shift Weigh-Up operator realized that a problem had occurred while plaintiff was working in Weigh-Up the evening of October 5, 2006 (the night that plaintiff became upset at the notion of working next to Grither). The day-shift operator discovered that it appeared that plaintiff had used raw material from an unapproved lot in four batches of mix, yet had verified in documentation that she had used raw material from a different, approved lot.[5] This issue was elevated to Batson, who reviewed it and determined that plaintiff had used raw material from an unapproved lot, yet verified on her mix sheets that she had used raw material from an approved lot. Batson recorded this discovery in an incident report.[6] As a result of this finding, Batson immediately quarantined the four batches of mix that plaintiff had weighed using unapproved raw material.

_____

[5]Defendant employs a process known as "reconciliation," where it tracks which raw materials go into which mixes.

[6]As stated below, plaintiff believes that her job was done correctly, and that she does not know what happened to make it appear as if her job was done wrong. However, plaintiff does not dispute that Batson made the above findings.

Based on these findings, Batson determined that plaintiff had used unapproved material in four different batches of mix and failed to conduct the required checks to confirm that the correct, approved material was used. Batson further determined that plaintiff had falsified the batch records by verifying with her signature multiple times that she had performed these required checks when she had not. Batson provided documentation of his investigation to Rohowetz, Vinlove, and Jones, and met with Rohowetz and Jones to explain his findings. Rohowetz, Jones, Batson, and Vinlove state that they held off on getting plaintiff's side of the story until the completion of her FMLA leave, because they did not want to interfere with plaintiff's FMLA leave.

Plaintiff returned to work upon the completion of her FMLA leave on January 8, 2007. At that time, Jones, Batson, Rohowetz, and Vinlove met with plaintiff. During the meeting, Rohowetz explained to plaintiff that, on her last night of work, unapproved material had been weighed up and put into four mixes. Plaintiff was asked what happened that night, and she said she did not know how the mix-up happened. Plaintiff was shown the four mix sheets that contained her signature verifying that she had used the approved lot referenced on the sheets, and done the required checks to confirm that the approved lot referenced had been used. When asked if the four mix sheets contained her signature, plaintiff admitted that they did. Plaintiff agrees that the conduct she was accused of during this meeting (i.e., not verifying the lot number as required) constituted a violation of defendant's policy.

Plaintiff stated at the meeting that she believed her job was done correctly, and that she did not know what occurred to make it appear as if it was done wrong. She further stated at the meeting that many things could have been changed, like, for example, the stickers on the drums could have been changed. Plaintiff further reiterated at the meeting that she had asked to go home and was told no. Finally, plaintiff alleged at the meeting (and appears to continue to allege) that it is possible she was set-up by co-workers. However, plaintiff does not dispute that there is no evidence of such activity.

Defendant determined that plaintiff had committed a serious violation of defendant's Employee Conduct Policy by failing to perform the required checks and falsifying the batch records. At the conclusion of the meeting, Rohowetz handed plaintiff a memorandum that explained the reasons for the termination of her employment.

Plaintiff has submitted facts regarding the disciplinary treatment of four other employees: Grither, John Layton, Post-Keller, and Dennis Keller. Plaintiff states that Grither received a verbal warning on March 30, 2005, for a documentation error; a written warning on December 14, 2006, for an average of 7.75 errors per month, a failure to fill out a bin ticket, entry of the wrong mix number on five bins of product, and mislabeling of a product sample; and a written warning extension on October 10, 2007, for a mistake that caused the rejection of 1,829 pounds of product. Plaintiff states that Layton received a written warning on April

10, 2006, for loss of critical paperwork; a written warning on August 24, 2006, for placing the wrong flavor in a production hopper; and an incident report on November 29, 2007, for violating the employee conduct policy of falsification of reports or records, or deliberate failure to accurately complete reports or records. With regard to Post-Keller, plaintiff states that she received a counseling and coaching on August 11, 2005, for what appears to be a documentation error; a PIP on December 20, 2005, for failure to play close attention to detail, produce work with a minimal amount of errors, follow up on errors and make corrections, use appropriate checks to ensure accuracy, and arrive on time; a second violation of paid time off policy on October 24, 2007; and a counseling for "misrepresentation, including falsification of reports or records, or deliberate failure to accurately complete reports or records." Finally, plaintiff states that Dennis Keller received a warning letter on June 1, 1998, for incorrectly recording product weights on a batch sheet; a verbal warning for aggressive behavior in March of 2006; and a counseling and coaching on December 20, 2007, for failure to get a "verified by" signature prior to starting the production process, which was deemed a "serious violation" of an SOP. Grither, Layton, Post-Keller, and Dennis Keller all continue to be employed by defendant.

Plaintiff filed this action against defendant on October 12, 2007, alleging that defendant violated the FMLA by unlawfully interfering with her FMLA leave and retaliating against her for having taken FMLA leave. Plaintiff believes that defendant

terminated her employment in part because defendant thought her need for FMLA leave was fake. Plaintiff also believes that her employment was terminated in part because of previous complaints she had made about perceived harassment. In this regard, plaintiff believes that defendant had been looking for a reason to terminate her since 2004. Since 2003, at least eighty-nine other employees have taken FMLA leave at defendant's St. Louis facility, including Grither, Layton, Post-Keller, and Dennis Keller.[7] Many of these employees have taken more than one FMLA leave since 2003. Other than those who have gone on Long Term Disability or otherwise voluntarily separated their employment, all of these employees were reinstated upon the conclusion of their FMLA leaves. Approximately ten other employees were on FMLA leave for some period of time while Plaintiff was on FMLA leave from October 6, 2006, to January 8, 2007. Other employees have gone out on FMLA leave for reasons similar to plaintiff's reason for leave, such as stress.[8]

## Discussion

The FMLA, 29 U.S.C §2601 et seq., entitles an employee to twelve workweeks of leave during any twelve-month period if he or she has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §2612(a)(1)(D). The FMLA creates two possible causes of

---

[7]Post-Keller and Dennis Keller have taken multiple FMLA leaves.

[8]The Court notes that plaintiff has submitted several pages of facts delineating the "long-standing harassment of plaintiff and others by [non-supervisory co-employee] Jan Grither." The Court has reviewed these facts and finds that, for purposes of the instant motion, they are not relevant.

action that an employee can assert against an employer whose actions infringed on that employee's rights guaranteed by the FMLA. The first is an interference claim, "in which the employee alleges that an employer denied or interfered with h[er] substantive rights under the FMLA." Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008) (quotation omitted). The second is a retaliation claim, and exists when "the employee alleges that the employer discriminated against h[er] for exercising h[er] FMLA rights." Id. In this case, plaintiff asserts both an interference claim and a retaliation claim against defendant. Both claims are analyzed by the Court below.

**Interference**

In order to state a claim for interference under the FMLA, a plaintiff must allege that the employer denied entitlements guaranteed under the FMLA. See Stallings v. Hussmann Corp., 447 F.3d 1041, 1051 (8th Cir. 2006). Interference claims are distinct from retaliation claims, and in some circumstances, a given set of facts will clearly implicate interference or retaliation. See id. In a case where a plaintiff takes the full twelve-week benefit assured by the FMLA but is subsequently terminated upon her return, that plaintiff's claim is "a claim for retaliation and should be analyzed as such." Id. (finding that, because the employer granted every request the employee made to take FMLA leave, the employee failed to establish that the employer denied him a benefit to which he was entitled).

In the matter currently before the Court, there is no material dispute regarding plaintiff's ability to take the full twelve-week benefit allowed under the FMLA after defendant was shown a doctor's letter indicating that such leave was necessary. Plaintiff's claim therefore must stem from her termination <u>after</u> her FMLA leave expired. Consequently, the Court will further consider only plaintiff's claim of retaliation, and will grant summary judgment in defendant's favor for any claim of interference.

**Retaliation**

In the absence of direct evidence of retaliation, FMLA retaliation claims are analyzed under the familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Phillips</u>, 547 F.3d at 912. Accordingly, the first step in analyzing a FMLA retaliation claim is determining whether a plaintiff has made a prima facie showing of retaliation. At this step, a plaintiff must show that she exercised rights afforded by the FMLA, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action. <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 832 (8th Cir. 2002) (citing <u>Darby v. Bratch</u>, 287 F.3d 673, 679 (8th Cir. 2002)). After a plaintiff has made a sufficient showing of a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. <u>Phillips</u>, 547 F.3d at 912. Once such a reason is articulated, the burden of production shifts back to the plaintiff

to demonstrate that the proffered non-discriminatory reason is a pretext for retaliation. Id. At this third step, a plaintiff is obligated to present evidence that: (1) creates a question of material fact as to whether the defendant's proffered reasons are pretextual; and (2) creates a reasonable inference that the defendant acted in retaliation to plaintiff's assertion of rights under the FMLA. Smith, 302 F.3d at 833. "To carry the burden of showing pretext, [plaintiff] ha[s] to show that [defendant's] justification for the firing [is] unworthy of credence." Id. at 833-34 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

The Court notes that while a strong prima facie case can also establish pretext, a mere temporal proximity does not. See id. at 834. Further, quarreling with the soundness of a business's judgment in selecting an employee for termination, without more, is not sufficient evidence for a reasonable inference of retaliation. See Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994). Disputes concerning the seriousness of various incidents "merely question[] the soundness of [a] defendant's judgment." Id. An employer may develop arbitrary, ridiculous, and even irrational policies so long as they are applied in a non-discriminatory manner, and retaliation claims do not require or authorize a court to engage in examination of the wisdom of an employer's judgment in personnel matters. See, e.g., McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 512 (8th Cir. 1995); Smith v. Monsanto Chem. Co., 770 F.2d 719, 723 n.3 (8th Cir. 1985).

Employment laws do not "prohibit employment decisions based on...factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." Rose-Maston, 133 F.3d at 1109.

Evidence that similarly-situated employees were treated differently can be evidence of unlawful conduct. To show that other employees are similarly situated, a plaintiff is "required to point to individuals who 'have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" Marquez v. Bridgestone/Firestone, Inc., 353 F.3d 1037, 1038 (8th Cir. 2004) (quoting Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000)). "Employees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways," and the test is a rigorous one. Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (quotation omitted). Offering nothing more than an opinion that other employees were not treated similarly is insufficient to create a genuine issue of fact for trial, and a plaintiff must substantiate her allegations with more than "speculation, conjecture, or fantasy" in order to survive summary judgment. Marquez, 353 F.3d at 1038 (quoting Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003)).

Plaintiff was fired the day she returned from FMLA leave. The Court finds that, in this case, the temporal proximity of returning from FMLA leave to plaintiff's termination is sufficient to satisfy plaintiff's initial burden of establishing a prima facie

case.  The Court further finds that defendant has offered non-discriminatory reasons for plaintiff's discharge, namely plaintiff's infraction history and the events of October 5, 2006. Accordingly, the burden shifts back to plaintiff to show that defendant's proffered reasons are pretexts for illegal retaliatory conduct under the FMLA.  The Court specifically notes that defendant's non-discriminatory reasons give sufficient explanation for the temporal proximity other than retaliatory motive, and more will be required of plaintiff to demonstrate pretext.

        The Court has considered the facts accepted as true for purposes of this motion in conjunction with plaintiff's arguments, and finds that plaintiff fails to create a question of material fact as to whether defendant's proffered reasons are pretextual. Plaintiff's attempts to raise disputes of material fact concerning defendant's failure to address Geitner's allegedly abusive behavior, defendant's other business-operation decisions, the seriousness of the incident that led to plaintiff's termination, and the credibility of plaintiff's co-workers do not preclude summary judgment in the clear absence of evidence that defendant terminated plaintiff in order to retaliate against her for exercising her rights under the FMLA.  Plaintiff's arguments do little more than quarrel with the soundness of defendant's business judgment in deciding to terminate plaintiff.  Plaintiff's focus on debating whether the disciplinary action she received was warranted by the nature of the alleged misconduct does not give rise to an

inference of unlawful conduct, particularly as plaintiff fails to dispute much of the conduct for which the discipline was imposed.

Further, while not conclusive evidence, the Court notes defendant's long-standing history of accommodating FMLA leave without incident. The Court finds this history weighs against plaintiff's assertion that defendant's justification for her termination is unworthy of credence, and that she was fired because she asserted FMLA rights.

Finally, plaintiff's attempt to demonstrate that similarly-situated individuals were treated differently fails to satisfy her burden of showing evidence of pretext. As an initial matter, defendant has provided undisputed evidence that all four of the employees to whom plaintiff attempts a comparison have also asserted rights under the FMLA. Accordingly, the Court finds that these individuals do not show that similarly-situated individuals were treated differently, as they are <u>within plaintiff's protected class</u>. Indeed, it would appear that defendant's treatment of these individuals weighs <u>against</u> plaintiff's current assertion that she was retaliated against for asserting FMLA rights. Further, it is clear that each employee to whom plaintiff claims a similarity has a distinguishing employment-violation history. It is not proper to evaluate each employee's past infractions and determine whether the aggregation of such conduct equals or is greater than plaintiff's own offense history.

In this case, the Court finds that plaintiff fails to demonstrate that other employees were similarly situated to

plaintiff and were treated more favorably. Further, because a court does not sit as a review board of the fairness of personnel decisions, other than to determine unlawful retaliatory motives, even if the Court were to consider plaintiff's allegations concerning the comparative treatment of other employees, her claims are not supported as required by law. In this case, the record fails to create a question of material fact as to whether defendant's proffered reasons are pretextual, or to create a reasonable inference that defendant acted in retaliation to plaintiff's assertion of rights under the FMLA. Aside from the temporal proximity, there is simply no evidence on the record that plaintiff's FMLA leave factored into defendant's decision to terminate her. Regarding plaintiff's retaliation claim, the Court will grant defendant's motion for summary judgment.

For the above stated reasons,

**IT IS HEREBY ORDERED** that defendant's motion to strike [Doc. #23] is denied.

**IT IS FURTHER ORDERED** that defendant Glaxo SmithKline Consumer Healthcare's motion for summary judgment [Doc. #14] is granted.

**IT IS FURTHER ORDERED** that the July 20, 2009, trial setting is hereby vacated.

Dated this _____29th_____ day of June, 2009.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE